### JACKSON v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. July 6, 1920. Rehearing Denied September 7, 1920.)

No. 3405.

1. **Criminal law ⬤⟫1170½ (5)—Exclusion of cross-examination as foundation for impeachment held harmless error.**

Error in excluding cross-examination as to whether witness did not make a certain statement contradictory of his testimony, in the presence of persons named, *held* not prejudicial, where such persons subsequently testified that the witness did make the statement.

2. **Forgery ⬤⟫48—Instruction as to presumption of intent approved.**

In a prosecution under Act Aug. 29, 1916, § 41 (Comp. St. § 8604u), for forging of bills of lading with intent to defraud, an instruction that a finding that the bills were delivered to defendant without the signature of the railroad agent, and that he negotiated them to secure money, would raise a presumption that he forged the agent's signature with intent to cheat and defraud, *held* not erroneous, where it expressly charged that such intent was essential and that guilt must be established on the whole evidence beyond a reasonable doubt.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Criminal prosecution by the United States against S. C. Jackson. Judgment of conviction, and defendant brings error. Affirmed.

Jackson was convicted under two counts of an indictment for violation of the act of Congress relating to bills of lading in interstate commerce, approved August 29, 1916 (39 Stat. p. 538 [Comp. St. § 8604u]). The charge was that

⬤⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

he forged certain interstate bills of lading, dated, respectively, September 15, 1917, and September 18, 1917, each bill purporting to represent a certain shipment of milk from Newberg, Or., to New York. In one count the shipment was charged to have been in car No. S P 91268, and in the other car No. S P 93659. Shipment was alleged to have been made from the Western Condensed Milk Company, consignor, to order of Logan Commercial Company. There was evidence tending to show the following state of facts:

The Western Condensed Milk Company, consignor, had a plant at Newberg, Or. The Scio Milk Company had a plant at Scio, Or. The Logan Commercial Company owned a controlling interest in the two milk companies. F. L. Daggett was local manager of the Western Condensed Milk Company and of the Scio Milk Company. Jackson was an owner in, and president and treasurer of, the Logan Commercial Company. Logan and Jackson owned the Logan Commercial Company, which was engaged in the milk brokerage business. About September 11, 1917, at Albany, Or., Jackson asked Daggett to make out two bills of lading for cars of milk, one to be shipped from Scio on the 18th, and one from Newberg on the 15th, saying that he might want to use the bills for a day or two at the bank until the cars came representing the shipments. Daggett made out the typewritten portion of two such bills of lading, and signed his name thereto, and mailed them to Jackson at a hotel in Portland, and returned to Newberg, where he found the bills of lading, which Jackson had returned to him. Daggett then telephoned to Jackson in Portland, and Jackson told him that he (Daggett) had used serial numbers of cars in only four figures, and that all of the cars ran in five figures, and that, instead of having one shipment come from Newberg and one from Scio, to make both come from Newberg. Daggett also testified that he then made out the bills of lading described in the indictment, but that the signature of the agent of the railroad company was not on the bills when they left his hands, and that he personally mailed them to Jackson at Seattle from Newberg on September 14th, and that they were in the same condition as when in evidence on the trial, except that the railway agent's name was not signed when he sent them. Witness said that he did not present the bills to the agent of the Southern Pacific Company; that no milk was delivered to the railway company represented by the two bills of lading.

Guild, manager of the Logan Commercial Company at Seattle, testified that to the best of his knowledge Jackson gave the bills of lading to him and told him to take them down and get them "diverted," and put them through in the usual course of business. Witness then took them to the railroad company, and had them diverted to the Oregon Railroad & Navigation Company for bills of lading, and took the bills to the bank and drew against Ward & Co. and got credit for the Logan Commercial Company. The evidence further tended to show that there was no such car in existence in September, 1917, as S P 93659, and that, although there was a car S P 91268, it was a gondola type, with a chute at the bottom, and that on September 15, 1917, the gondola car was in California, and not in Oregon, and never during the month of September, 1917, was car No. 91268 loaded or shipped from Newberg, Or.

James, the agent of the Southern Pacific Company at Newberg, Or., testified that the signature, G. W. James, and the initials, C. S., upon the bills of lading described in the indictment, were not his signatures, and were not signed by any person authorized by the Southern Pacific Company; that neither of the bills of lading referred to in the indictment was ever issued by the Southern Pacific Company; that in all cases bills of lading were made out by shipper, who put the car number and initial in, and that the railway company would then check it; that the Western Condensed Milk Company would load the car at its plant, and before the agent would sign the bill of lading he would check the car. Witness further gave a detailed statement of the only cars that went out of the Southern Pacific yards at Newberg from the plant of the Western Condensed Milk Company during September, 1917, and the list did not include the car numbers referred to.

Defendant denied that he ever had any conversation with Daggett about the preparation of the bills of lading, and denied any knowledge of them or

of their negotiations; said that he left Seattle on the 14th of September, 1917, and went to Tillamook, Or., and did not return to Seattle until the morning train of the 19th, having left Portland for Seattle on the night of the 18th. The theory of the defendant was that Daggett did not write the bills of lading at Albany, Or., but wrote them at Newberg, in the usual course of business, and that the two carloads of milk were shipped on the bills of lading, or that he wrote the bills for his own purpose, to cover up some possible shortage in his accounts.

Jay C. Allen and George H. Rummens, both of Seattle, Wash., for plaintiff in error.

Robert C. Saunders, U. S. Atty., and Ben L. Moore, Asst. U. S. Atty., both of Seattle, Wash.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). It is said that the court erred in excluding a copy of letter dated December 8, 1917, written by Logan Commercial Company, by J. R. Guild, manager, to Daggett, at Corvallis, Ore. The letter advised Daggett that the representatives of the Oregon-Washington Railway & Navigation Company had called upon the Logan Commercial Company concerning two cars shipped in September, 1917, which appeared to have the wrong car numbers. Guild, as manager, states in the letter that he is not familiar with the situation, and trusts that Daggett will be able to give the railroad company the information they desire. We do not see how the exclusion of this letter could have prejudiced the rights of the defendant. The letter refers to the lack of familiarity of the writer, Guild, with the situation. Inasmuch as Jackson testified that he disclosed everything to the railway officials, the letter could throw no light upon the situation as explained afterwards by Jackson.

The next contention is that the defendant was prejudiced by the limitations imposed by the court in the cross-examination of the witness Daggett. In the course of the cross-examination Daggett was asked this question:

"Knowing the fact he was going to use them to palm off on the bank, but you yourself helped him write them. Is that true?"

There was no error in excluding the question. It was argumentative in form, and assumed a state of facts contrary to that testified to by the witness.

Nor did the court err in sustaining objections to cross-questions put to Daggett in respect to the insurance business, with which Daggett testified he had at one time been connected. The witness said that he had been in the insurance business after he had served as mayor of Spokane; but the exact nature of the insurance business carried on by him was wholly irrelevant to the case on trial.

[1] Error is assigned to the sustaining of objections to the following cross-question put to Daggett:

"Did you not in the presence of those three (Van Osdol, Kirkup, and Phelps) say in substance and in effect that Jackson was not in town at that time (September 17, being the time witness took the books to Seattle), and you could not see him while you were in Seattle?"

Inasmuch as the witness Daggett had testified that he believed that he had seen the defendant Jackson in Seattle about the time he took certain books up to that city (September 17), the question asked was proper, as laying a foundation for the introduction of impeaching evidence. But the error could not have been prejudicial, because upon the examination of Phelps, called by the defendant, he testified that about the 18th of September, when Daggett returned to Newberg, after having been to Seattle, the witness heard Daggett, in the presence of Kirkup and Van Osdol, say in substance and effect that he had been sent to Seattle on a wild goose chase; that he went there to fix the books, but when he got there he found that Guild was sick; that Jackson was not in town, that Logan was not there, and that he had to come right back. The witness Van Osdol, also called by the defendant, testified that he heard Daggett say something to the same effect. The third person, Kirkup, was not called.

The next point urged is that the court erred in excluding an exhibit offered by defendant for identification. Daggett had testified that he never had "signed bills of lading until the carloads of milk were actually shipped out." For the purpose of discrediting this statement, and to show a contrary practice, counsel sought to introduce a letter, written by Daggett at Newberg, dated September 26, 1917, wherein he said that—

"Logan is going to Corvallis this evening. Will leave bills of lading for car now loading, so there will be no delay when loaded, whether I get back or not."

The letter was dated after the transactions under investigation were had, and had no direct bearing upon the contention that Daggett testified falsely when he said that he never had signed bills of lading until the carloads of milk were actually shipped out.

Guild testified on cross-examination that the bills of lading came to the office for shipment of carloads of milk upon which there were no car numbers. The question was then asked whether such bills of lading were signed by the agent. Witness Guild said: "I have." The answer was stricken out, and defendant excepted. The purpose of the cross-examination, as stated by defendant's counsel, was to show that the railway agent at Albany, Ore., often sent out bills of lading with no car numbers on them. Granting that there was such a loose practice pursued on the part of the agent at Albany, it had no relevancy to the matter connected with the bills of lading issued at Newberg, and involved in the particular transaction under investigation. But, however that may be, defendant was not injured, as Guild later testified directly that sometimes bills of lading had come to the office without the railway agent's signature, and that cars sometimes reached their destination where the car numbers were different from the numbers included in the bills of lading.

It is next urged that the court erred in denying the offer of testimony of certain statements made by Jackson. There was evidence tending to show that Jackson, prior to September 14th, had announced his intention of going to Tillamook, Or. Counsel for defendant sought to prove by the witness Van Osdol that Jackson had talked with him

concerning establishing a plant at Tillamook, and thus wanted to corroborate the theory of the defense that prior to the 15th of September Jackson had stated to the witness that he intended to go to Tillamook for that purpose. Inasmuch as there was the direct statement of Jackson to the effect that he was not in Seattle at the time that became a material issue, the fact that Jackson had stated to Van Osdol that he intended to go to Tillamook would not be of probative value.

On cross-examination the witness Guild was asked whether or not, about December 1st, he did not locate two cars of Western Condensed Milk, one at Boston and one at Bordeaux, for which there were no bills of lading. The witness replied that there were two cars not located, but that he could not say they both came from the Western Condensed Milk Company but he believed they did, but he could not swear where they originated; that he could not trace the bills of lading with respect to those cars, and that he had no personal knowledge of the matter at all. The bill of exceptions does not show that the court sustained objections to the testimony just referred to; but, assuming that counsel correctly states that counsel for the government objected to such testimony, and that the objection was sustained, and that exception was noted, we fail to see where there was error in the ruling. Surely the misdirection or loss of two cars, as referred to, did not tend to relieve the defendant of the crime of forging the bills of lading described in the indictment.

[2] Objection is made to an instruction to the effect that, if the jury were satisfied that the bills of lading were delivered to Jackson without the signature of the railway agent being attached, and that Jackson issued the bills by delivering them to a subordinate in his office, to be negotiated and to secure advances, then the presumption would be that he forged the name of the railway agent, and that unless such persumption was rebutted, or the evidence raised a reasonable doubt of guilt, a verdict of guilty should be rendered. In the same instruction the court expressly charged that intent to cheat and defraud must appear from the evidence, in order to warrant the conclusion that the defendant acted with unlawful intent charged, and that if, upon the entire evidence, there was a reasonable doubt of guilt, defendant must be found not guilty. Thus the instruction defined the offense charged as always including the element of intent to defraud as an essential ingredient, and laid down the proposition that, if Jackson received the bills of lading without the signature of the railway agent, and negotiated them to secure money, then the presumption would be he intended to cheat and defraud, and that unless he rebutted the presumption, or there was a reasonable doubt of his intent, he should be convicted. The presumption was in no way regarded as conclusive. This is in accord with the rule in forgery cases. Spencer v. Commonwealth, 2 Leigh (Va.) 751; State v. Britt, 14 N. C. 122; Underhill on Cr. Evi. § 423; State v. Williams, 152 Mo. 115, 53 S. W. 424, 75 Am. St. Rep. 441.

Other objections to the charge are of less importance. They have received attentive consideration and are not grounds for disturbing the judgment.

We are asked to reverse the case because the court declined to instruct the jury to find the defendant not guilty for lack of insufficient evidence. But as the verdict was predicated upon substantial evidence to support it, this court will not say that the lower court should have directed acquittal.

Judgment affirmed.